COMMONWEALTH vs. WILLIAM A. SELLON.

Norfolk. December 5, 1979. — March 25, 1980.

Present: HENNESSEY, C.J., QUIRICO, WILKINS, LIACOS, & ABRAMS, JJ.

*Practice, Criminal,* Assistance of counsel, Instructions to jury. *Evidence,* Hearsay, Spontaneous utterance, Business record, Relevancy and materiality, Cumulative. *Homicide.*

At a murder trial, the defendant was not denied the effective assistance of counsel by his attorney's failure to interview or call certain witnesses where the decision not to call the witnesses was a choice of tactics fairly debatable on the record and where the defendant was not prejudiced by the failure to interview. [223-226]

There was no merit to a defendant's contention that he was denied the effective assistance of counsel by his attorney's failure to prepare certain witnesses prior to trial. [226-227]

There was no merit to a defendant's contention that he was denied the effective assistance of counsel because his attorney's "investigator," who was a disbarred attorney, sat at the counsel table and offered advice both on trial tactics and when to make objections until the attorney was admonished by the judge for allowing the investigator to participate. [227-228]

At a murder trial, the defendant was not denied the effective assistance of counsel by his attorney's failure to object to the jury instructions on manslaughter *as given,* or *to seek further instructions.* [228-229]

At a murder trial, there was no error in admitting hearsay evidence of statements made by the victim within minutes of the time the incident occurred. [229-230]

At a murder trial, the judge did not err in concluding that a police log as to telephone calls received at the station met all the requirements of the business records exception to the hearsay rule created by G. L. c. 233, § 78. [230]

At a murder trial, certain real evidence introduced by the Commonwealth was neither irrelevant nor unduly prejudicial. [230]

At a murder trial, where there was evidence indicating that the victim had suffered third degree acid burns over forty per cent of his body surface, the defendant was not prejudiced by the prosecutor's use of the phrase "the great amount of acid." [231]

At a murder trial, the judge's instructions with respect to manslaughter were proper and adequately conveyed to the jury that the Commonwealth had the burden of proving beyond a reasonable doubt the elements of manslaughter. [231-233]

At a murder trial, there was no error in the judge's additional instructions on inference which were given after the jury had begun deliberating. [233-234]

INDICTMENT found and returned in the Superior Court on April 24, 1978.

The case was tried before *Linscott, J.*, and a motion for a new trial was heard by him.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Melvin S. Louison* for the defendant.

*Charles J. Hely,* Assistant District Attorney (*Thomas E. Norton,* Assistant District Attorney, with him) for the Commonwealth.

ABRAMS, J.   Convicted of manslaughter on an indictment charging murder in the first degree, the defendant William A. Sellon appeals.   G. L. c. 278, §§ 33A-33G.   Sellon also appeals from the denial of a motion for new trial based on a claim that at trial he was denied the effective assistance of counsel.   The appeals were consolidated, and we transferred the case here on our own motion.   We affirm the judgment and the denial of the motion for a new trial.

Sellon's principal argument[1] is that he was denied the effective assistance of counsel at trial.   Sellon points to (1) trial counsel's decision not to offer certain statements made by the victim to hospital nurses, and counsel's failure to interview these nurses; (2) counsel's supposed failure to adequately "prepare" certain defense witnesses; (3) the activities of a disbarred attorney at the counsel table during part of the trial; and (4) counsel's failure to request additional

---

[1] Assignments of error not briefed are deemed waived.   *Commonwealth v. Amazeen,* 375 Mass. 73, 74 n.1 (1978).

jury instructions or to object to the instructions actually given.

Regarding his conviction, Sellon argues assignments of error asserting (1) that his conviction was based on inadmissible hearsay; (2) that certain real evidence was admitted without an adequate foundation; (3) that questions put to a witness by both the prosecutor and the trial judge improperly assumed an ultimate question of fact; and (4) that jury instructions regarding the crime of manslaughter were inaccurate and confusing and that further instructions, on the drawing of inferences, given to the jury after their deliberations had begun, were impermissibly prejudicial.

We briefly summarize the evidence presented at trial.[2] Shortly before 6 A.M. on Saturday, February 18, 1978, Sellon arrived at the Quincy residence of his father-in-law, Carl Dahl. Sellon knocked on the front door, and Dahl, who was up and dressed at the time, let him in. In his jacket pocket, Sellon had a bottle of highly concentrated plumber's acid. The men proceeded down a hallway to the kitchen.

At the time of the alleged crime, Ellie Rukkinen, a friend of Dahl's from their childhood days in Finland, had been staying at Dahl's home for approximately six months. Rukkinen did not speak English. Rukkinen heard Sellon's knock and saw him in the house with Dahl. When Rukkinen, in a bedroom off the hallway, heard a noise from the kitchen, she went to the kitchen to see what had happened. Dahl was seated on the floor, and a brown substance was spattered on the floor, walls, ceiling, refrigerator, and curtains. Rukkinen, with Sellon's assistance lifted Dahl from the floor, and Rukkinen took Dahl to the bathroom.

Rukkinen testified that in the bathroom, Dahl said to her in Finnish that "Billy [Sellon] hit him [Dahl] the first time from behind." After Rukkinen attempted to wash Dahl off in the bathroom, Dahl was taken to the bedroom. Rukkin-

---

[2] Additional evidence will be set forth in our review of the errors alleged, and in our discussion of the motion for a new trial.

en testified that, in the bedroom, within a few minutes of the time she first saw Dahl seated motionless on the floor, he said, in Finnish, "Oh, Billy, why did you do this to me?" (Sellon does not speak Finnish.)

Dahl was taken to Quincy City Hospital and later the same day to University Hospital in Boston, where he was treated for third degree burns covering forty per cent of his body. These burns had been caused by exposure to a highly concentrated acid. Dahl's death on April 15, 1978, was caused by his acid burns and subsequent infection.

1. *Ineffective assistance of counsel.* In assessing whether a defendant has been denied the effective assistance of counsel, we have engaged in a "two-step inquiry." *Commonwealth* v. *Rondeau,* 378 Mass. 408, 412 (1979). Sellon must show both (1) that the conduct of his trial counsel fell "measurably below that which might be expected from an ordinary fallible lawyer," *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974), and (2) that "prejudice result[ed] therefrom." *Commonwealth* v. *Rondeau, supra.*

a. *Failure to call nurses as witnesses.* The Commonwealth maintained that Sellon had deliberately poured acid on Dahl. In support of its theory, it offered the two statements Rukkinen said Dahl made just after he was burned. While they were hearsay, these statements were properly admitted as spontaneous exclamations.[3]

Sellon, on the other hand, claimed that the acid spilled accidentally. Testifying in his own defense, Sellon indicated that he had brought the acid with him from his home in Canton, where he kept a supply of plumber's acid for use in clearing clogged drains in two apartment buildings which he owned. He testified that upon entering Dahl's house, he went directly to the kitchen, opened the bottle which contained the acid, and then asked his father-in-law to watch how the acid would clear the drain.[4] Not-

---

[3] See 229-230, *infra.*

[4] The credibility of Sellon's motive for bringing the acid with him was called into question by Rukkinen's testimony that she had used the kitchen

ing that the walkway into Dahl's house had been partially covered with snow, Sellon continued that he slipped on the floor of the kitchen, and the contents of the bottle flew all over the room, landing in part on his father-in-law.

A police officer who had responded to the scene on the morning that Dahl was burned testified at trial that Sellon told him, "We were cleaning the sink drain and I slipped and spilled the acid." Sellon's wife, furthermore, testified that at University Hospital on the day he was burned her father told her, "It was an accident."

Sellon's counsel knew that four nurses at Quincy City Hospital had given separate statements to the police to the effect that Dahl had stated at the hospital that he (Dahl) had spilled the acid on himself accidentally.[5] Sellon alleges that trial counsel's failure to call these nurses as witnesses constitutes ineffective assistance of counsel. We disagree.

The choice facing trial counsel in deciding whether or not to call the nurses was more difficult than Sellon suggests. The statements by Dahl to the nurses could have been used to impeach Dahl's statements to Rukkinen which had been admitted as spontaneous exclamations.[6] The judge, how-

---

sink daily before Dahl was burned, and had encountered no problem with the drain.

[5] The prosecutor told Sellon's counsel about the statements at the probable cause hearing. Approximately six months prior to trial, the prosecution furnished counsel with copies of the statements.

[6] The record indicates that Sellon's trial counsel and the judge both viewed the nurses' testimony as admissible. The Commonwealth suggests to this court that the statements were hearsay and hence inadmissible. However, the trial judge might properly have admitted Dahl's statements to the nurses for impeachment purposes. Where an exception to the hearsay rule allows the admission of a statement by an out-of-court declarant, this statement is subject "to impeachment in the appropriate ways" (italics omitted). 3A J. Wigmore, Evidence § 884 (Chadbourn rev. 1970). See Fed. R. Evid. 806 ("When a hearsay statement . . . has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness"). The spontaneous exclamation exception to the hearsay rule effectively allowed the Commonwealth, through the testimony of Rukkinen, to place Dahl on the stand to testify that Sellon hit him (i.e., Dahl) from behind. The nurses' testimony

ever, indicated that if the nurses were called to testify to what Dahl had said to them, he might permit the introduction of another damaging statement made by Dahl to Rukkinen.

The Commonwealth had attempted to introduce this additional statement through testimony by Rukkinen to the effect that at the hospital Dahl told her, "Look out for Billy [Sellon]. He will kill you, just as he tried to kill me." The trial judge ruled this testimony inadmissible since the statement occurred more than an hour after Dahl was burned, and thus could not constitute a spontaneous exclamation.[7] See generally *Commonwealth* v. *Hampton*, 351 Mass. 447, 449 (1966). The judge specifically indicated, however, that he would reverse his decision to exclude this testimony if "any contrary statements" by Dahl (such as his statements to the nurses) were to be introduced by the defense.[8] The choice facing Sellon's trial counsel was further complicated by the fact that Dahl's statements to the nurses directly contradicted Sellon's own testimony in that Dahl said that he, not Sellon, had spilled the acid accidentally.[9]

For these reasons the question whether or not to use the nurses as witnesses posed a significant tactical dilemma. When "arguably reasoned tactical or strategic judgments of a lawyer are called into question," in order to find ineffective assistance of counsel, "we require that such judgments

---

as to what Dahl said at the hospital thus was admissible for impeachment purposes as evidence of inconsistent statements made by Dahl prior to the time of trial. See generally W.B. Leach & P.J. Liacos, Massachusetts Evidence 114-119 (4th ed. 1967).

[7] The judge couched his ruling in terms of "res gestae." See note 14, *infra*.

[8] Since this contingency did not arise, the judge had no occasion to consider limiting instructions. The parties do not suggest that it would have been correct to admit Dahl's statements to the nurses or his additional statement to Rukkinen for purposes other than impeachment.

[9] Dahl's statements to the nurses might well have been attacked by the Commonwealth as reflecting Dahl's embarrassment at being the victim of a violent crime committed by a family member, or Dahl's desire to protect his son-in-law by falsely blaming himself.

be [shown to be] 'manifestly unreasonable.'" *Common-wealth* v. *Rondeau,* 378 Mass. 408, 413 (1979), quoting from *Commonwealth* v. *Adams,* 374 Mass. 722, 728 (1978). Since the choice of tactics by Sellon's trial counsel is fairly debatable on the record before us, ineffective assistance of counsel has not been demonstrated.[10]

Sellon contends, however, that his trial counsel's failure to interview the nurses, in and of itself, constituted ineffective assistance of counsel. Such an omission by defense counsel in a first degree murder case may well amount to "serious incompetency . . . or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer." *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974). However, even if his trial counsel's failure to investigate constitutes sufficient incompetence to satisfy the first of *Saferian's* two tests, Sellon has failed to show how he was prejudiced by this failure to interview the nurses. In response to Sellon's motion for a new trial, the judge found that the affidavits obtained from the nurses by Sellon's appellate counsel indicate that "[w]hat they [the nurses] would say . . . is really not different from what they had told the District Attorney" (i.e., the statements provided to defense counsel). The record affords no basis for us to conclude otherwise.

b. *Failure to prepare witnesses.* Sellon argues that his trial counsel failed to "prepare" him (Sellon), his wife, and other family members prior to their testifying as defense witnesses. "Preparation" in this context refers not to a general interview with a witness in order to determine what he or she knows concerning an event,[11] but rather to a discus-

---

[10] In his findings on Sellon's motion for a new trial the judge noted that "[a]n issue much discussed before and during trial was whether the nurses should be called as witnesses." The choice not to call the nurses, the judge concluded, "does not appear to me to be unwise, even in hindsight."

[11] Sellon does not contend that his trial counsel was unfamiliar with the substance of the matters testified to by family members, or that such members had not discussed what they knew about the case with counsel.

sion designed to review the specific matters likely to be testified to at trial.

Sellon grounds his argument on affidavits by himself and by family members, and on lengthy testimony by his trial counsel at a hearing on his motion for a new trial. During the course of this hearing, trial counsel conceded that he did not prepare one minor witness, Sellon's son Raymond. Trial counsel insisted, however, that he had prepared all other family members. The judge chose to believe this testimony and found that affidavits by these family members to the effect that they had not been prepared were not credible.

Sellon argues that these findings were based only on the affidavits, and thus are subject to an independent reassessment by this court. The findings, however, were not based simply on affidavits. The judge had before him the testimony of trial counsel, and, in addition, he relied on his observation during the trial of the family members' testimony, in which he found no indication of confusion. Findings based on the testimony of witnesses as well as affidavits are "not ordinarily to be overturned on appeal." *Commonwealth* v. *Rondeau*, 378 Mass. 408, 413 (1979). See *Commonwealth* v. *Brown*, 378 Mass. 165, 171-172 (1979), and cases cited.

Moreover, even if trial counsel wholly failed to prepare his witnesses, Sellon has failed to demonstrate any "issue of fact or law that [as a result] could have been but was not exploited by counsel for the defendant's benefit in the original proceedings." *Commonwealth* v. *Saferian*, 366 Mass. 89, 98 (1974). Even if a defendant demonstrates a deficiency in pretrial preparation, "the defendant [can] make no headway in the absence of a showing that the fault probably resulted in forfeiture of a substantial defence." *Id.*

c. *Presence of disbarred attorney at the counsel table.* Sellon's trial counsel introduced one Joseph Passaretti to the judge and jury as an "investigator." Passaretti was allowed by the judge to sit at the counsel table. At a bench conference during the course of the trial, the judge chastised Sellon's trial counsel for allowing this "investigator" to offer

advice both on trial tactics and on more specific matters, such as when to make objections. After this admonition, Passaretti ceased his participation.

The judge subsequently learned that Passaretti was a disbarred attorney. In his ruling on Sellon's motion for a new trial, the judge noted, "However reprehensible it may have been to introduce him [Passaretti] as an investigator and have him sit at counsel table, . . . the jury never learned anything about this." The judge specifically found that "Passaretti's presence at the counsel table had no measurable detrimental effect on the trial."

Whatever may be the consequences to Sellon's trial counsel,[12] this conduct on his part can only amount to ineffective assistance of counsel if it is shown that Sellon was thereby likely to have been deprived of a substantial defense. The judge found that Passaretti's presence did not affect Sellon's defense. We have no basis to conclude otherwise.

d. *Failure to object to jury instructions.* The failure of Sellon's trial counsel to object to the jury instructions on manslaughter as given, or to seek further instructions, may plausibly be viewed as the product of a tactical decision. Trial counsel could reasonably have believed that additional elaboration by the judge on the manslaughter instructions would have lessened Sellon's chances of a not guilty verdict. If the jury believed the testimony of Sellon, his wife, and other family members, a not guilty verdict was required. Viewed in this light, we cannot say that trial counsel's decision, "arguably reasoned," *Commonwealth* v. *Rondeau,* 378 Mass. 408, 413 (1979), not to seek modification of the manslaughter instructions lay "beyond the range of reasonableness." *Commonwealth* v. *Adams,* 374 Mass. 722, 730 (1978). In any event, we find the instructions to be adequate and not erroneous. See *infra* at 231-233.

We conclude that the judge did not abuse his discretion in denying Sellon's motion for a new trial. *Commonwealth* v.

---

[12] The judge indicated that he would take appropriate action after the trial concluded. The record does not indicate what further action was undertaken by the judge.

*Satterfield,* 373 Mass. 109, 116 (1977). *Commonwealth* v. *Devereaux,* 257 Mass. 391, 394 (1926).[13]

2. *Evidentiary issues.* Sellon grounds the appeal of his conviction in part on claims that there were errors in the judge's rulings on evidence. We consider each of these claims in turn, and conclude that there was no error.

a. *Statements by Dahl to Rukkinen.* Central to the Commonwealth's case was testimony by Rukkinen that, as she was attempting to clean the acid off Dahl in the bathroom, he said to her in Finnish, "Billy hit [me] the first time from behind." Rukkinen also testified that, after Dahl had been taken to the bedroom, he said again in Finnish, "Oh, Billy [Sellon], why did you do this to me?"

Sellon argues that both statements constitute hearsay, and that neither falls within a recognized exception to the hearsay rule. We think, however, that the judge was correct in admitting the statements since they constitute spontaneous exclamations.[14] Each statement was made within minutes of the time the incident occurred.

The judge could well have concluded within his "broad discretion" that Dahl's statements were made "before there [had] been time to contrive and misrepresent . . . . It is to be observed that the statements need not be strictly contem-

---

[13] Sellon suggests on this appeal that we should define the standard for effective assistance of counsel by reference to the ABA Standards Relating to the Defense Function (Approved Draft 1971). However, we adhere to our previous rejection of this suggestion. *Commonwealth* v. *Saferian,* 366 Mass. 89, 99 n.15 (1974). As we said then, the standards themselves indicate that they are "intended as guides for conduct of lawyers and as the basis for disciplinary action, not as criteria for judicial evaluation of the effectiveness of counsel to determine the validity of a conviction."

[14] The judge admitted the statements because they were part of the "res gestae." We have previously noted that "the phrase 'res gestae' has been applied frequently 'to the Hearsay Exception for *Spontaneous Exclamations* . . . i.e. statements made during or after an affray, a collision, or the like, used to prove the facts asserted in the statement.'" *Commonwealth* v. *McLaughlin,* 364 Mass. 211, 221 n.3 (1973), quoting from 6 J. Wigmore, Evidence § 1768 (3d ed. 1940). We prefer the more specific term "spontaneous exclamation." See 6 J. Wigmore, Evidence §§ 1767, 1768 (Chadbourn rev. 1976).

poraneous with the exciting cause; they may be subsequent to it, provided there has not been time for the exciting influence to lose its sway and to be dissipated. . . . [T]here can be no definite and fixed limit of time. Each case must depend upon its own circumstances." *Commonwealth* v. *McLaughlin*, 364 Mass. 211, 223 (1973), quoting from 6 J. Wigmore, Evidence § 1750 (3d ed. 1940). Cf. *Commonwealth* v. *Hampton*, 351 Mass. 447, 449-450 (1966) (no error to admit hearsay evidence of a statement made by the victim five to six minutes after the stabbing occurred).

b. *Police log.* Sellon also describes as inadmissible hearsay a Quincy police journal entry showing the time at which a call was received from the Dahl residence on the morning of February 18. The record, however, indicates that the judge had ample basis for concluding that the police log as to telephone calls received at the station met all the requirements of the business records exception to the hearsay rule created by G. L. c. 233, § 78.[15]

c. *Admission of bottle labelled "Liquid Drano."* Sellon contends that real evidence, specifically, a bottle labelled Liquid Drano, was improperly admitted, in that it was both irrelevant and unduly prejudicial. The bottle was found by police in the cellar of the Dahl residence, pursuant to a search warrant, on the day of Sellon's arrest, eleven days after Dahl was burned. The presence in Dahl's cellar of a bottle, labelled Liquid Drano, containing some type of liquid, tended to support the Commonwealth's argument that it was unnecessary for the defendant to have brought plumber's acid to Dahl's house. "Whether such evidence was so inflammatory in nature as to outweigh its probative value and preclude its admission is a question to be determined by the trial judge in the exercise of his sound discretion." *Commonwealth* v. *D'Agostino*, 344 Mass. 276, 279 (1962).[16]

---

[15] "The operations of the instrumentalities of government constitute 'business' within the meaning of the statute . . . ." *Sawyer & Co.* v. *Southern Pac. Co.*, 354 Mass. 481, 484 (1968), quoting from *LaPorte* v. *United States*, 300 F.2d 878, 880 (9th Cir. 1962).

[16] The absence of any chemical analysis, and the fact that the bottle was found eleven days after the crime, went to the weight, not to the admissi-

d. *Use of the phrase "the great amount of acid."* Sellon, testifying in his own defense, was asked by both the prosecutor (over defense counsel's objection) and the judge, whether a "great amount" of acid had struck Dahl.[17] At the time the questions were asked the evidence indicated that Dahl suffered third degree acid burns over forty per cent of his body surface. The judge was fully justified in concluding that Sellon would not be prejudiced by being asked to answer a question including the phrase "the great amount of acid."

3. *Jury instructions.* Sellon argues two errors in the instructions to the jury: (1) that the instructions on manslaughter were inadequate, and (2) that the instructions on inferences were prejudicial. We disagree.

a. *Involuntary manslaughter.* Sellon argues that the charge (1) failed to impart to the jury a clear understanding of the crime of involuntary manslaughter; (2) failed to relate legal principles to the evidence in the case so as to aid the jury in understanding the issues presented for their decision; and (3) failed to place upon the Commonwealth the burden of proving beyond a reasonable doubt both the elements of manslaughter and the absence of the defense of accident. In support of his conclusions Sellon parses the charge and attacks it piecemeal. We, however, view the charge in its entirety since the adequacy of instructions must

---

bility of the evidence. See *Commonwealth* v. *Ross,* 361 Mass. 665, 679 (1972), vacated on other grounds, 410 U.S. 901, aff'd on remand, 363 Mass. 665, cert. denied, 414 U.S. 1080 (1973) (fact that there was no testimony as to the type of blood on blood-stained paper money went to the weight, not to the admissibility of the evidence).

[17] The prosecutor asked Sellon whether he was aware of the "great amount" of acid that had struck Dahl; when defense counsel objected, the following exchange occurred in the presence of the jury:

THE JUDGE: "Well, there is no question about that, is there?"
THE WITNESS: "I was aware of it."
THE JUDGE: "A great amount did strike him, is that correct?"
THE WITNESS: "Yes, your Honor."

The prosecutor subsequently asked whether Sellon had observed "the great amount of liquid" on Dahl, and Sellon replied, "I did."

be determined in light of their over-all impact on the jury.[18] See *Commonwealth* v. *Godin,* 374 Mass. 120, 130 (1977). See also *Commonwealth* v. *Rhoades,* 379 Mass. 810, 824 (1980).

The judge defined involuntary manslaughter as "an unlawful homicide — that means a killing — unintentionally caused by an act which constitutes such a disregard of the probable, harmful consequences to another as to constitute wanton and reckless conduct." When the jury, during its deliberations, requested the judge to define for them again the crimes of murder and manslaughter, the judge stated that "involuntary manslaughter . . . means that the person involved has such total disregard of the rights and safety of somebody else that you can say his conduct was what we call willful and wanton and resulted in bringing about the death." See *Commonwealth* v. *Vanderpool,* 367 Mass. 743, 747 (1975).

The judge carefully distinguished the possibility of accident from the possibility that Sellon used the acid "in such an outrageous manner that his conduct amounted to wanton and reckless misconduct." The defendant's conduct, as the judge indicated, must evidence a "total" disregard for the rights and safety of another. The judge gave the jury two examples of wilful and wanton conduct. Read as a whole, the instructions adequately conveyed to the jury the appropriate standard on which to impose liability.[19] Cf. *Commonwealth* v. *Rhoades,* 379 Mass. 810, 825 (1980).

---

[18] Since there is no exception to this aspect of the charge, we review the challenged instructions to determine whether the charge as given created "a substantial risk of a miscarriage of justice." *Commonwealth* v. *Freeman,* 352 Mass. 556, 564 (1967).

[19] We also find adequate the manner in which the judge introduced the issue of involuntary manslaughter. The judge said, "Now, suppose you make up your minds that the facts indicate to you that the defendant didn't trip and fall and thus spill the product but that he used the product in such an outrageous manner that his conduct amounted to wanton and reckless misconduct." The judge then defined involuntary manslaughter and gave the jury other examples of wilful and reckless conduct. Viewed as a whole, we conclude there was no error.

Finally, we find no merit in Sellon's contention that the charge failed to place on the Commonwealth the burden of proving beyond a reasonable doubt the elements of manslaughter. The judge instructed generally that the Commonwealth has the burden of proving guilt beyond a reasonable doubt, and that this burden never shifts to the defendant, but remains continuously upon the Commonwealth. The judge specifically instructed that the Commonwealth must show that the acid spill was not an accident, and then, in his next sentence, he referred to "the government satisf[ying] [the jury] beyond a reasonable doubt" that the incident was more than an accident. At the end of the portion of his charge related to manslaughter, moreover, the judge referred to the testimony of the defendant and other witnesses and instructed the jury to consider "whether the government has satisfied you beyond a reasonable doubt that a crime has been committed." We think that the judge more than adequately conveyed to the jury the burden of proof carried by the Commonwealth.

b. *Inference instruction.* Sellon's final argument alleges that the judge's additional instructions on inferences suggested that he could be convicted upon a standard of proof lower than proof beyond a reasonable doubt (1) because these instructions were given after the jury began deliberating, thereby giving undue emphasis to inferences, and (2) because the judge did not repeat in his additional instructions his earlier discussion of the basic constitutional guaranties which must be included in the charge to the jury in a criminal case.[20]

The judge's additional instructions, however, although delivered after a period of jury deliberation, must be read in

---

[20] The instructions were given in the course of answering a question from the jury as to the definitions of two medical terms from the Quincy City Hospital: "ENT" and "CNS." By agreement the jury was told that ENT meant ear, nose, and throat, and that CNS meant central nervous system. The defendant's exception, taken before the instructions were given, was a general objection that an instruction on inferences was being given at that time.

light of the entire charge. The judge in giving further instructions is not required to repeat all aspects of his prior charge. *Commonwealth* v. *Peters,* 372 Mass. 319, 324-325 (1977). Viewed as a whole, the charge to the jury indicated that it was the jury's duty to find that the Commonwealth had met its burden of proving every element of the crime beyond a reasonable doubt before they could convict.

*Judgment affirmed.*

*Order denying defendant's motion
for a new trial affirmed.*