## Commonwealth *vs.* Sam Smith.

Suffolk. October 5, 2007. - January 11, 2008.

Present: Marshall, C.J., Greaney, Cowin, Cordy, & Botsford, JJ.

*Homicide. Practice, Criminal,* Capital case, Instructions to jury, Challenge to jurors, Argument by prosecutor, Disclosure of evidence. *Joint Enterprise. Evidence,* Joint enterprise, Motive, Hearsay, Relevancy and materiality, Exculpatory. *Witness,* Impeachment.

At a murder trial, the judge properly admitted testimony of a police officer concerning the defendant's gang affiliation and activity, where the evidence was relevant to the issues of motive and joint venture [397-399]; where the testimony was, in large part, based on the officer's own observations and, to the extent that it constituted improper opinion evidence and might have been based on hearsay sources, was essentially cumulative [399]; and where the judge's lengthy limiting instruction, included in his final charge to the jury, minimized the prejudicial impact of the testimony, despite the judge's failure to give a limiting instruction at the time the evidence was introduced [400].

The defendant at a murder trial failed to demonstrate that a single ambiguous statement in the judge's instructions concerning the defendant's prior and subsequent conduct, even if error, substantially swayed the jury's verdict. [400-403]

The evidence at a murder trial was sufficient to establish the defendant's guilt as a joint venturer. [403-404]

The record in a murder trial did not supply the necessary factual foundation for this court to determine the merits of the defendant's argument that the prosecutor had improperly used a peremptory challenge to remove a juror who might have been either homosexual or transgendered, in violation of the defendant's constitutional rights to equal protection and to a fairly representative jury. [404-407]

A criminal defendant failed to demonstrate any error arising from the prosecutor's impeachment of the defendant's witness with evidence of prior convictions [407-408]; from the prosecutor's closing argument, which included both an inference that, while perhaps overly fanciful, was fairly drawn from the evidence [408], and a comment that constituted a legitimate attempt to defend the credibility of certain Commonwealth witnesses [408]; from the prosecutor's failure to provide advance notice to the defendant of an unanticipated change in the testimony of the Commonwealth's ballistician [408-409]; or from the prosecutor's failure to provide, and defense counsel's failure to request, certain allegedly exculpatory evidence in the possession of Federal authorities [409-410].

INDICTMENT found and returned in the Superior Court Department on September 17, 1999.

The case was tried before *James D. McDaniel, Jr.*, J., and a motion for a new trial, filed on June 23, 2004, was heard by *Carol S. Ball*, J.

*David H. Mirsky* for the defendant.

*Kathleen Celio*, Assistant District Attorney, for the Commonwealth.

BOTSFORD, J. In June, 2001, a jury convicted the defendant of murder in the first degree[1]; in 2006, a judge, who was not the trial judge, denied the defendant's motion for a new trial. The defendant makes several arguments on appeal, including that the judge erroneously admitted evidence of the defendant's gang affiliation, introduced prejudicial evidence during his final jury instructions, and allowed the prosecutor's peremptory challenge of a juror claimed to be transgendered or homosexual. He argues also that there was insufficient evidence to warrant his conviction as a joint venturer, that his only witness was improperly impeached with evidence of a prior conviction, and that the prosecutor's closing argument contained several impermissible statements. We affirm the conviction and decline to grant relief under G. L. c. 278, § 33E. We also affirm the denial of the defendant's motion for a new trial.

1. *Background.* We summarize the facts as the jury could have found them, reserving further details for discussion of the specific issues raised. On August 16, 1991, the victim, Steven Gaul, was standing with several friends close to a park bench in Ramsey Park, near Lenox Street in the Roxbury section of Boston. The victim lived in Columbia Point, in the Dorchester section of Boston, and was a member of a gang of young men from Columbia Point known as the Columbia Point Dawgs. The defendant and two other men, K.J. Walker and David Walker, all wearing black hooded sweatshirts, entered the park. The defendant and his two companions were all associated with the Lenox Street gang. The three men approached the victim, and K.J. Walker shot him once in the stomach and then ran out of

---

[1]The Commonwealth proceeded on theories of both deliberate premeditation and extreme atrocity or cruelty both as a principal and joint venturer. The jury rejected the theory of extreme atrocity or cruelty.

the park. The victim fell to the ground. The defendant then stood above him and fired several shots directly at him. The defendant's gun jammed and there was a pause in the shooting as he removed the bullets wedged in the gun's chamber. As he did so, the victim reached up with his hands raised. The defendant said, "I told you I'm gonna get you, bitch," and after reloading the gun, fired several more shots at the victim, who fell back to the ground. Patrick Culbreath, a friend of the victim, was watching from across the park and fired several shots at the defendant, who returned Culbreath's fire. The defendant then walked toward the park's entrance and was joined by Steven Kindell, who was wearing a white shirt and riding a bicycle. The two left the park together.

Kerryn Fernandes and her father, Julio Fernandes, observed the shooting as they drove by the park, although they could not identify the faces of the participants. They were on their way to an apartment located one block from the park. They parked their vehicle near the park, and as they walked from the vehicle to the apartment, Kerryn saw the defendant and Steven Kindell walking toward them on the sidewalk. Kindell, whom Kerryn knew from the neighborhood and had previously dated, said "hi" to Kerryn. Kerryn also knew the defendant, and knew that he and Kindell both lived nearby. She recognized the clothes the pair were wearing as identical to the clothes of the shooter and his companion on the bicycle, both of whom she had observed minutes earlier in the park. She turned to her father and said, "Dad, there they are."

2. *Gang-related activity.* At trial, the Commonwealth offered testimony of Sergeant Robert Merner of the Boston police department, who worked in the department's anti-gang violence unit from its inception in May, 1990, and inferentially through 1991. Merner briefly described gangs in Boston in general terms, and then testified more particularly about the Lenox Street gang, whose members he saw congregating near Ramsey Park in 1990 and 1991. He knew the defendant, knew that the defendant was a member of the Lenox Street group,[2] and would frequently see the defendant in the early 1990's in the company of a number

---

[2]The judge requested that the prosecutor and a witness called by the Commonwealth use the phrase "Lenox Street group" rather than "Lenox Street gang."

of individuals, including David Walker, K.J. Walker, and Steven Kindell. Merner was also familiar with the Columbia Point Dawgs, knew the victim as well as other young men in that group, and was aware that in 1991 there was a conflict between the Lenox Street group and the Columbia Point Dawgs over the drug trade in Ramsey Park. Finally, Merner testified that he was aware of separate incidents in March and November of 1991, when a total of four young men from Columbia Point were shot, at least one of them at a location next to Ramsey Park.[3]

a. *Evidence of gang affiliation and activity.* The defendant objected before and during trial to the admission of evidence relating to his gang affiliation and to the shootings that took place in March and November, 1991. He raises this objection again on appeal. He makes three arguments: (1) the evidence of gang activity and gang affiliations was irrelevant to show the identity of the person or persons who committed the murder of the victim, and admission of this evidence was prejudicial because its effect was to show bad character and criminal propensity on the defendant's part; (2) the evidence presented by Sergeant Merner about the two gangs and the other shootings was inadmissible because it was based on hearsay; and (3) the judge did nothing to minimize the inherent prejudice of this evidence by, for example, screening the pool of potential jurors for gang-related bias or giving limiting instructions during and at the end of the trial. Given the defendant's objections at trial, we review these nonconstitutional claims for prejudicial error. See *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).

i. *Gang activity and affiliations.* There was no error in admitting evidence concerning the Lenox Street gang and the Columbia Point Dawgs, or the defendant's membership in the former. The Commonwealth's theory was that the hostility between the

---

[3]The defendant was charged with these shooting offenses and had been convicted of them at the time of the trial in this case. However, the trial judge denied the Commonwealth's preliminary motion to admit evidence concerning the defendant's role in these crimes, and no evidence relating to the defendant's connection to them was introduced during the defendant's trial. The defendant nonetheless raises a claim on appeal about his connection to these 1991 shooting crimes because the judge touched on the point in his final instructions to the jury. We discuss separately the defendant's claim concerning these other shootings *infra*.

gangs over use of Ramsey Park as a venue for drug sales provided a motive for killing the victim, a member of the Columbia Point Dawgs, while he was in the park. The Commonwealth also presented the case on the theory that the defendant and other Lenox Street gang members killed the victim as part of a joint venture. We have upheld the admission of evidence of gang affiliations on the issues of motive and joint venture. See, e.g., *Commonwealth* v. *Swafford*, 441 Mass. 329, 332 (2004), and cases cited. The defendant asserts that evidence about his gang affiliation should have been excluded because it did not help to identify him specifically as the individual responsible for the murder. Such a showing, which is required when prior bad acts are used for identification purposes, see *Commonwealth* v. *Baker*, 440 Mass. 519, 530-531 (2003), is beside the point when evidence of gang affiliation is used for purposes of showing motive or joint venture. See *Commonwealth* v. *Swafford, supra.*

ii. *Sergeant Merner.* The prosecutor asked Merner about his sources of intelligence gathering as a member of the anti-gang violence unit. Merner answered that he obtained information from police incident reports as well as the "use of informants, street sources of information, the school police, teachers, probation officers, enemies." The defendant takes from this response that essentially all of Merner's testimony was inadmissible because it was based on hearsay. This conclusion is not correct. In large part, Sergeant Merner testified about his own observations of the defendant and his associates (for example, K.J. Walker, David Walker, and Steven Kindell) during Merner's very frequent visits to Ramsey Park and its surroundings in 1990 and 1991. He also testified to personal familiarity with the young men who lived at Columbia Point and who were members of the Columbia Point Dawgs, including the victim. Even if Merner's testimony about the defendant's and victim's respective gang affiliations may have constituted arguably improper opinion evidence and may have been based on hearsay sources, any error was harmless because the evidence was cumulative; other witnesses testified from personal knowledge essentially to the same effect.[4] See *Commonwealth* v. *Thomas*, 429 Mass. 146, 159-160 (1999).

---

[4] Damion Howell, who had lived in the Lenox Street neighborhood around

iii. *Minimizing prejudice.* The defendant is correct that in cases involving the introduction of evidence about gang affiliations, we have stressed that trial judges should take steps to minimize the prejudicial impact of this evidence. See, e.g., *Commonwealth* v. *Swafford,* 441 Mass. at 332, citing *Commonwealth* v. *Correa,* 437 Mass. 197, 201 (2002); *Commonwealth* v. *Smiley,* 431 Mass. 477, 484 (2000); *Commonwealth* v. *Maldonado,* 429 Mass. 502, 504 (1999). While the defendant contends that the judge failed to undertake any steps in this case to ameliorate the prejudice of the gang evidence, the judge did give a lengthy limiting instruction as part of his final charge. It would have been preferable had the judge also screened potential jurors during the empanelment process about their ability to hear gang-related evidence and remain impartial, and had he given a limiting instruction at the time the evidence was introduced during the trial, but his failure to do so does not constitute an error warranting reversal.

b. *Jury instructions.* The judge included in his final instructions a charge defining joint venture and then turned to the subject of prior and subsequent bad acts:

> "We say in the law that evidence may not be offered at a trial that a defendant may have previously misbehaved for the purpose of showing his bad character or propensity to commit the crime for which he is being tried. However, such evidence may be offered at trial and considered by the jury only for a very limited purpose. . . .
>
> "[T]here was testimony in the case to the effect that, as I recall it, that the defendant was a member of a particular group called the Lenox Street group or gang. And there was also other testimony to the effect that David Walker and Kevin Walker and Steven Kindell were also members

the time of the murder and for years before, testified about his knowledge and observations of the defendant and many of the individuals with whom he associated in and around Ramsey Park and Lenox Street in 1991; about the victim and his association with the Columbia Point Dawgs; and about the conflict between the Lenox Street and Columbia Point groups over selling drugs in Ramsey Park. Odie Calhoun, who had lived in Columbia Point at the time of the murder, similarly testified about "problems" between the Lenox Street and Columbia Point individuals, and that the victim was a member of the Columbia Point Dawgs.

of the Lenox Street group. There was further evidence that the Lenox group hung out near a certain flag pole at 609 to 611 Shawmut Avenue which was in close proximity to the park there, Ramsey or Derby Park, when the killing of Steven Gaul occurred.

"There was also evidence introduced as I recall that Steven Gaul, the alleged victim in this case, was a member of the Columbia Point Dawgs, a gang from Columbia Point.

"Further evidence was offered to the effect that . . . in March of 1991, Mark Crump, a member of the Columbia gang[,] was shot at Lenox Street and Shawmut Avenue. And there was further testimony that some people by the name of Hightower and Snead were also shot in November of 1991 in the area.

"There was also evidence offered that there was a conflict between the two groups, the Lenox Street group and the Columbia Point group, concerning alleged drug trade in Ramsey Park.

"Now, that evidence, as I say, is not offered to show the propensity of the defendant in this case to commit the crime in this case. *It's strictly, this evidence of his prior conduct and subsequent conduct, prior conduct as far as the crime is concerned and subsequent conduct*, are offered for a very limited purpose, and you have to consider this very, very closely. It's only admitted in the case for the limited purpose of the jury's consideration on the issues of joint venture — that is whether or not the defendant was involved in a joint venture with those, with some people to commit the crime charged in this case — the defendant's state of mind, intent, and knowledge and motive with respect to the circumstance of the crime charged in this case, and also for your consideration on the matter of the entire relationship between the defendant and Steven Gaul."

(Emphasis supplied.)

On appeal, the defendant focuses on the judge's reference to "this evidence of *his* prior conduct and subsequent conduct" (emphasis supplied). The defendant argues that this comment

necessitates reversal because the judge effectively stated that the defendant had committed the 1991 shootings to which the judge had referred, even though no evidence linking the defendant individually to these shootings was introduced at trial. His counsel objected to this portion of the instruction at trial for essentially the same reason, and therefore the claim of error is preserved.

The judge's reference to the defendant's "prior conduct and subsequent conduct" was ambiguous. Insofar as the statement might be interpreted to include the judge's specific summary of the other shooting evidence, it would constitute error.[5] However, the reference followed the judge's summary of all the trial evidence relating to gang affiliations and activities, not just the shooting, and thus could be understood to indicate that the whole of the evidence about the Lenox Street gang might be considered prior or subsequent conduct connected to the defendant only as a member of that group. The judge did not link his statement about the defendant's prior and subsequent conduct to the shootings in particular, and certainly made no explicit reference to the defendant in connection with those shootings. Moreover, the ambiguous statement was just one portion of a sentence in a lengthy instruction that began and ended forcefully with the point that *all* the evidence about prior and subsequent conduct could not be considered as showing the defendant's propensity to commit the crime; it was, the judge stated, admitted only for consideration

---

[5]In this regard, the reference is akin to the misstatement of evidence by a prosecutor during a closing argument. See, e.g., *Commonwealth* v. *Santiago*, 425 Mass. 491, 499-500 (1997), *S.C.*, 427 Mass. 298 and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998); *Commonwealth* v. *Kozec*, 399 Mass. 514, 516 n.2, 522 (1987). The question that arises is whether that error was prejudicial. See *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).

The defendant asserts that the error was of constitutional significance, because, in effect, the judge was providing the jury with false evidence, and a conviction based on knowing use of such evidence violates the due process clause of the Fourteenth Amendment to the United States Constitution. The defendant cites *Donnelly* v. *DeChristoforo*, 416 U.S. 637, 646 (1974), and *Napue* v. *Illinois*, 360 U.S. 264, 269 (1959). The constitutional argument fails. The problem presented here is that the judge could be understood to have suggested a fact that was not supported by the trial evidence. But the fact suggested — that the defendant was responsible for the shootings — was not false: the defendant had indeed been convicted of these shootings. See note 3, *supra*. The claimed error did not amount to a denial of due process.

on the issues of joint venture, the defendant's motive and state of mind, and the relationship between the defendant and the victim.

"[T]he adequacy of instructions must be determined in light of their over-all impact on the jury." *Commonwealth* v. *Grant*, 418 Mass. 76, 85 (1994), quoting *Commonwealth* v. *Sellon*, 380 Mass. 220, 231-232 (1980). The challenged instruction is clearly not a model to be followed. However, the evidence of the defendant's guilt in this case, primarily supplied by eyewitnesses to the murder, was very strong. In the circumstances, accepting for argument the defendant's interpretation of the judge's reference, we are able to conclude that the jury's verdict was not "substantially swayed" by the judge's one misstatement, and that the error was not prejudicial. *Commonwealth* v. *Flebotte*, 417 Mass. at 353, quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983).

3. *Sufficiency of joint venture evidence.* The Commonwealth presented this case as a joint venture among members of the Lenox Street gang, with the defendant playing a central role. During the final charge conference, defense counsel argued that there was insufficient evidence of joint venture liability in connection with the murder — that the Commonwealth's case focused almost entirely on the defendant as the principal. The judge rejected the claim and instructed the jury on both individual and joint venture liability. The jury slip did not ask the jury to differentiate between the two.

On appeal, the defendant repeats his objection to the sufficiency of the joint venture evidence. The trial record defeats the point. The victim had been shot five times. Two bullets with different calibers were found in his body, signifying at least two different guns, and a police ballistician testified that indeed four guns had been used during the murder. There was evidence that the defendant walked into Ramsey Park with two other men; that one of these other two, K.J. Walker, shot the victim in the stomach and ran out of the park; that the victim fell to the ground; and that the defendant himself then shot the victim several times, using a single gun. This was clearly ample evidence to support the defendant's culpability as both principal and a joint venturer. See *Commonwealth* v. *Kent K.*, 427 Mass. 754, 762 (1998). See also *Taylor* v. *Commonwealth*, 447 Mass. 49, 54-55 (2006). Contrast

*Commonwealth* v. *Berry*, 431 Mass. 326, 332-333 (2000) (where there was insufficient evidence of defendant's liability as joint venturer and jury did not differentiate between individual and joint venture liability, conviction reversed and verdict set aside).

4. *Peremptory challenge.* The defendant argues that the prosecutor improperly used a peremptory challenge to remove a juror who may have been either homosexual or transgendered,[6] in violation of the equal protection clause and the defendant's constitutional right to a fairly representative jury.

The factual background is the following. The empanelment process included individual questioning by the judge of all the jurors. After the juror in question responded to the judge that he was a hairdresser's assistant and worked in a beauty salon, the prosecutor attempted to challenge the juror for cause because, the prosecutor said, the juror had some "identification issues," seemed to be a man dressed as a woman, and appeared to have breasts. The defense counsel responded, "I see a man who maybe at best I would argue might be a homosexual. And if the Commonwealth's intention is to challenge on the homosexuals . . . ." The judge immediately denied the challenge for cause, and the prosecutor promptly exercised a peremptory challenge. The following exchange then occurred:

> DEFENSE COUNSEL: "Your Honor, I'd like to put on the record that I'm beginning to see a pattern on the basis of the Commonwealth with the exclusion of a homosexual, white male. So I want to put that on the record as well."

> THE JUDGE: "Okay. You've put it on the record."

> DEFENSE COUNSEL: "For the Court's consideration. Thank you."

---

[6]"Homosexual" refers to a person who is sexually attracted to people of the same sex, and the designation is distinct from a person's status as transgendered. See *Ulane* v. *Eastern Airlines, Inc.*, 742 F.2d 1081, 1083 n.3 (7th Cir. 1984), cert. denied, 471 U.S. 1017 (1985). "Transgender" is an umbrella term used to describe all individuals who exhibit a gender identity that does not conform to societal expectations, including transsexuals, transvestites, and others who engage in a gender expression that is different from that associated with their biological sex. See Coffey, Battling Gender Orthodoxy: Prohibiting Discrimination on the Basis of Gender Identity and Expression in the Courts and in the Legislatures, 7 N.Y. City L. Rev. 161, 164 (2004).

THE PROSECUTOR: "Just so I may be crystal clear, there's absolutely no pattern. I don't even know of any even homosexuals that have been before us."

"This particular gentleman was dressed, in my opinion, like a female and he has breasts and so forth. And, frankly, I was just looking at this from a common sense point of view.

"This guy has a lot of identification issues, and I don't —"

THE JUDGE: "Well, first of all you have a right to present a challenge. You can challenge a person for any reason, as long as it's not illegal. It's very simply put."

Defense counsel stated nothing further about the juror, and the empanelment procedure moved to the next juror.

Article 12 of the Massachusetts Declaration of Rights proscribes the use of peremptory challenges "to exclude prospective jurors solely by virtue of their membership in, or affiliation with, particular, defined groupings in the community." *Commonwealth* v. *Soares*, 377 Mass. 461, 486, cert. denied, 444 U.S. 881 (1979). Those groupings are defined by art. 1 of the Massachusetts Declaration of Rights, as amended by art. 106 of the Amendments (Equal Rights Amendment), which protects against discrimination based on sex, race, color, creed, or national origin. *Id.* at 488-489 & n.33. See *Commonwealth* v. *Wood*, 389 Mass. 552, 560, 564 (1983). To date, this court has not considered the question whether the exercise of a peremptory challenge to remove a juror because of his or her sexual orientation or because the juror was transgendered would violate the guarantees of art. 12 or the equal protection clause. Nor, it appears, has any other court. We do not reach the question in this case because the record does not supply the necessary factual foundation.

The exchange between counsel and the judge during the voir dire of the juror reflects confusion in several respects. Defense counsel appeared to object to the prosecutor's supposed use of a peremptory challenge to remove the juror on the basis of homosexuality, while the prosecutor seemed clearly to focus on what he perceived to be the transgendered appearance of the juror.

None of the judge's comments offers additional insights about the juror, and thus we have no information about the juror's sex or transgendered status beyond the superficial observation that the juror appeared, at least to one person, to be a man with breasts, dressed as a woman. The juror did not identify himself as homosexual, and there was no evidence offered from any other sources on this issue. Further adding to the ambiguity, defense counsel did not make an explicit objection to the challenge, and instead only "put on the record" that she was "beginning to see a pattern" of removing white male homosexuals.

When analyzing a challenge for a *Soares* violation we begin with the presumption that a peremptory challenge is proper. *Commonwealth* v. *Soares*, 377 Mass. at 489. The defendant may rebut that presumption by showing that "(1) a pattern of conduct has developed whereby several prospective jurors who have been challenged peremptorily are members of a discrete group, and (2) there is a likelihood they are being excluded from the jury solely by reason of their group membership." *Id.* at 490. Although in some cases a prima facie case of impropriety may be established by the challenge of a single prospective juror, see *Commonwealth* v. *Fryar*, 414 Mass. 732, 738 (1993), *S.C.*, 425 Mass. 237, cert. denied, 522 U.S. 1033 (1997), defense counsel neither objected to the prosecutor's challenge nor asserted that a pattern of improper exclusion actually had been established. Accordingly, counsel did not trigger an obligation on the judge's part to make a finding whether the presumption of propriety was rebutted. A judge may, of course, raise the issue of a *Soares* violation sua sponte. *Commonwealth* v. *Maldonado*, 439 Mass. 460, 463 (2003). However, given the factual uncertainty in this case about what, if any, discrete "grouping" the juror might fit into, it was not error for the judge to fail to do so. See *Commonwealth* v. *LeClair*, 429 Mass. 313, 321 (1999) ("A trial judge is in the best position to decide if a peremptory challenge appears improper and requires an explanation by the party exercising it").

While in *Soares* the defendant relied solely on art. 12, and this court's opinion did as well, see *Commonwealth* v. *Soares*, 377 Mass. at 477-488, the decisions of the United States Supreme Court on peremptory challenges have focused on the equal protection clause of the Fourteenth Amendment to the

United States Constitution; these decisions have concluded that the clause protects the rights of both litigants and jurors to "jury selection procedures that are free from state-sponsored group stereotypes rooted in, and reflective of, historical prejudice." *J.E.B.* v. *Alabama ex rel. T.B.*, 511 U.S. 127, 128 (1994). See *Powers* v. *Ohio*, 499 U.S. 400, 410-415 (1991) (criminal defendant has standing to raise equal protection rights of juror excluded from jury by prosecutor's race-based exercise of peremptory challenge). The defendant's equal protection argument suffers from the same weakness as his art. 12 claim. The factual ambiguity surrounding the juror's sex, transgendered status, and sexual orientation, as well as the motive or reason for the prosecutor's challenge, combined with the absence of an objection from defense counsel when the challenge was made, impeded the trial judge's ability to draw an inference that purposeful discrimination had occurred. See *Johnson* v. *California*, 545 U.S. 162, 170, 173 (2005).

5. *Remaining claims of error.* We consider briefly the defendant's remaining challenges, concluding that none has merit.

a. *Impeachment of defendant's witness.* Ruth Thompson was the only witness called by the defendant. She was walking by the park when the shooting occurred, and at trial, she testified that the defendant was not the shooter. On cross-examination, the prosecutor impeached Thompson's credibility by introducing evidence of her convictions, including a 1998 conviction of sexual conduct for a fee.[7] The defendant contends that evidence of this conviction should have been excluded, arguing that it was not relevant to Thompson's credibility. Under G. L. c. 233, § 21, evidence of a witness's prior convictions may be used to impeach the witness's credibility if the convictions meet the requirements of that section, but convictions relevant to credibility are not limited to crimes involving dishonesty or false statements. See *Commonwealth* v. *Carter*, 429 Mass. 266, 268-269 (1999). See also *Commonwealth* v. *Harris*, 443 Mass. 714, 720 (2005), quoting *Commonwealth* v. *Fano*, 400 Mass. 296,

---

[7]The Commonwealth also introduced evidence of her prior convictions of credit card misuse, receiving stolen property, breaking and entering, and possession of a hypodermic needle and syringe. The defendant does not contest the admission of that evidence.

302-303 (1987) (theory behind § 21 is that witness's "earlier disregard for the law may suggest to the fact finder similar disregard for the courtroom oath"). There was no error.

b. *Prosecutor's closing argument.* The defendant challenges two portions of the prosecutor's closing argument. He contends that the prosecutor improperly introduced nonexistent evidence of the defendant's thoughts by telling the jury that the defendant thought, as he stood above the victim, "Geez, that damn gun; I just can't get it to work." We conclude this remark, unobjected to at trial, did not create a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Marquetty*, 416 Mass. 445, 450 (1993). The prosecutor's comment clearly represented an imaginary thought sequence, based on the evidence presented during the trial that the defendant's gun had jammed during the shooting and the defendant had paused to fix it. The comment appears to represent an inference, albeit perhaps an overly fanciful one, that might be fairly drawn from this evidence.[8]

The defendant also asserts that the prosecutor improperly vouched for the credibility of the Commonwealth's witnesses when he said that Kerryn and Julio Fernandes had no motive to lie, and that the police cared about doing their job properly. A prosecutor is permitted to "make a fair response to an attack on the credibility of a government witness." *Commonwealth* v. *Chavis*, 415 Mass. 703, 713 (1993). In her closing, defense counsel argued that Kerryn and Julio Fernandes's testimony was not truthful. The prosecutor's challenged comment was a legitimate attempt to defend the credibility of these two witnesses. See *id.* Similarly, the prosecutor's statement that the police cared about the outcome of the case was an inference drawn from the evidence of the investigation conducted by the police, and fairly responded to defense counsel's argument that the police investigation in the case had been sloppy and careless.

c. *Ballistics testimony.* Carl Washington, the Commonwealth's ballistician, submitted a report in which he described one of the bullets recovered from the victim's body as part of a .380 cali-

---

[8]The defendant also argues that defense counsel's failure to object to the comment was ineffective assistance of counsel. Because we conclude there was no error, counsel was not ineffective for any failure to object. See *Commonwealth* v. *Kirwan*, 448 Mass. 304, 317 (2007).

ber bullet. On cross-examination, he stated that the partial bullet could also have been a nine millimeter bullet. The defendant argues that the Commonwealth failed to notify him of a change in the testimony of one of its experts. From the prosecutor's questions on direct examination, it is clear that the Commonwealth itself did not anticipate the change in testimony,[9] and therefore could not have provided the defendant with advance notice of the change. Compare *Commonwealth* v. *Gilbert*, 377 Mass. 887, 892-896 (1979) (prosecutor erred in failing to inform defense counsel that government witness had changed expected testimony, but error in judgment did not warrant new trial), with *Commonwealth* v. *Vaughn*, 32 Mass. App. Ct. 435, 440-441 (1992) (prosecutor's failure to discuss change in key witness's testimony required new trial).

d. *Discovery from Federal authorities.* Two of the Commonwealth's witnesses, Odie Calhoun and Damion Howell, had each been convicted in the past of Federal drug offenses. Both had also entered agreements with prosecutors — Howell with the district attorney's office, and Calhoun with Federal prosecutors — to testify at the defendant's trial in exchange for filing other unrelated drug charges (in Howell's case), or to obtain a reduced sentence (in Calhoun's). Evidence of these two witnesses' agreements was before the jury. The defendant argues, however, that the Commonwealth should have been required to request from Federal law enforcement authorities any exculpatory material relating to Howell and Calhoun; he also presents counsel's failure adequately to demand such material as ineffective assistance.

In certain circumstances the Commonwealth is required to seek exculpatory material known to be in the possession of Federal authorities. See, e.g., *Commonwealth* v. *Donahue*, 396 Mass. 590, 599 (1986) (in circumstances presented, State prosecutor obliged to seek from Federal authorities exculpatory witness statements of material trial witness who was being held

---

[9]The prosecutor suggested that the reason the defendant's gun had jammed was because he was firing .380 caliber bullets from a nine millimeter gun. To further this theory, he questioned the ballistician to make clear that a nine millimeter gun was capable of firing .380 caliber bullets, but that to do so could cause a misfire.

in Federal protection); *Commonwealth* v. *Liebman*, 379 Mass. 671, 675 (1980) (State prosecutor required to obtain exculpatory Federal grand jury minutes of two key prosecution witnesses). This is not such a case. The Commonwealth provided the defendant with evidence of its cooperation agreement with Howell and of Calhoun's cooperation agreement with the Federal government. The defendant does not suggest that there is any additional exculpatory evidence held by Federal authorities,[10] and the Commonwealth was not required to provide anything more than it did. Nor was defense counsel's failure to press for such information ineffective assistance. Counsel used the two cooperation agreements vigorously to attack the credibility of both Calhoun and Howell. Counsel was not required to pursue alternative routes to seek additional statements that might possibly serve the same purpose. See *Commonwealth* v. *Fisher*, 433 Mass. 340, 357 (2001).

6. *G. L. c. 278, § 33E.* We have reviewed the entire record and have found no grounds warranting relief under G. L. c. 278, § 33E.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*

---

[10]While arguing a pretrial motion the defendant's counsel referred generally to "debriefing memos, notes, and investigatory reports" that she described as being ordinarily compiled by the United States Marshal's office whenever someone is held in Federal custody, but she offered no factual support for this assertion, and no indication that such materials existed in relation to Howell or Calhoun.